maintains offices in this District, Ardent Domestic received investor funds in this District, and the Defendants misappropriated investor funds for personal use from bank accounts serviced by banks in this district.

## THE DEFENDANTS

10.     **Northshore** is a Delaware limited liability company based in Chicago. Northshore has three principals: Kelley, Sherman and Wildeman. In April 2003, Northshore purchased all the partnership interests in SCM, the General Partner of Ardent Domestic and the investment adviser to Ardent Domestic and Ardent Offshore.

11.     **Ardent Domestic** is a hedge fund structured as a New York limited partnership that was organized by Saldutti in February 1992. According to its offering memorandum, Ardent Domestic's principal place of business is 153 East 53rd Street, New York, New York, and the object of Ardent Domestic is to achieve "superior capital appreciation over the long-term through the purchase, sale and short sale of public market securities in the technology industry." On March 23, 1992, Ardent Domestic filed an exemption from registration on Form D with the Commission. Ardent Domestic maintains prime brokerage accounts at Banc of America Securities ("BOA"). As of December 31, 2004, Ardent Domestic had 57 investors and approximately $38 million in assets.

12.     **Ardent Offshore** is also a hedge fund structured as an open-ended limited liability investment company incorporated in September 1997 under the International Business Companies Act of 1989 of the Commonwealth of the Bahamas. Ardent Offshore maintains offices in Nassau, Bahamas. SCM has acted as Ardent Offshore's investment adviser since July 1998, and has managed it in an identical manner as Ardent Domestic. Ardent Offshore

maintains prime brokerage accounts at BOA. As of December 31, 2004, Ardent Offshore had approximately $19.8 million in assets.

13. **SCM** is a New York limited partnership located in New York, New York. Saldutti founded SCM in 1992 and was its General Partner until April 2003. In April 2003, Northshore purchased all of the partnership interests in SCM, including Saldutti's general partnership interest. As part of the transaction, SCM's Limited Partners received limited partnership interests in Ardent Domestic. SCM has been the General Partner of, and investment adviser to, Ardent Domestic since 1992. SCM has acted as Ardent Offshore's investment adviser since July 1998.

14. **Kelley**, age 49, resides in Greenwich, Connecticut. Kelley is a founder and one of the three principals of Northshore and during the relevant period acted as its Chief Executive Officer.

15. **Wildeman**, age 41, resides at 2624 Breckenridge Lane, in Chicago, Illinois. Wildeman is one of Northshore's principals and its Managing Partner.

16. **Sherman**, age 39, resides at 550 N. Kingsberry, in Chicago, Illinois. Sherman is one of the three principals of Northshore.

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

17. **Saldutti**, age 56, resides in Pound Ridge, New York. Saldutti founded Ardent Domestic in 1992 and Ardent Offshore in 1997. From 1992 to April 2003, Saldutti was the managing General Partner of SCM, Ardent Domestic's general partner and the Ardent Funds' investment adviser. In April 2003, Saldutti sold his general partnership interest in SCM to Northshore, and entered into an employment contract with Northshore whereby Saldutti became

6

a Senior Managing Director at Northshore. As Senior Managing Director, Saldutti continued as portfolio manager to the Ardent Funds.

18. **BOA** is the custodian and the prime broker of the Ardent Funds. The Ardent Funds' prime brokerage accounts were serviced by BOA account representatives located in New York, New York.

## FACTS

A.  **The Ardent Funds**

19. Ardent Domestic's Confidential Private Offering Memorandum (the "Domestic POM") represents that Ardent Domestic's investment objective is to achieve "superior capital appreciation over the long-term through the purchase, sale and short sale of public market securities in the technology industry."

20. In addition, the Domestic POM provides that Ardent Domestic's investment portfolio will consist primarily of common stocks and cash equivalents.

21. Although the Domestic POM allows Ardent Domestic to invest in debt or preferred securities, which are not convertible into common stock, it states that such investments "will not ordinarily represent a large portion of the Partnership's portfolio in relation to its holdings of equity securities."

22. Further, the Domestic POM represents that Ardent Domestic will maintain a minimum level of diversification in its portfolio; specifically, it states: "[t]he General Partner will not invest more than 15% of the net assets of the Partnership...in the securities of any one company."

23. The Domestic POM also represents that "[a]ll investment decisions concerning [Ardent Domestic's] assets and funds will be made by Mr. Saldutti."

7

24. As in the Domestic POM, Ardent Offshore's Offering Memorandum (the "Offshore POM") represents that the main objective of Ardent Offshore is "superior capital appreciation over the long-term with no more than moderate risk."

25. The Offshore POM also represents that: (i) Ardent Offshore's portfolio will consist primarily of publicly traded technology oriented common stocks and cash equivalents; (ii) Saldutti will make all investment decisions concerning Ardent Offshore's assets and funds; (iii) Ardent Offshore will maintain a minimum level of diversification by representing that "[t]he Trading Advisor will not invest more than 15% of the net assets of the Company . . . in the securities of any one company;" and (iv) notice will be given to each Ardent Offshore shareholder within 15 business days if there is "any change in the delegation of operational responsibilities by [Ardent Offshore]" or if there is "any material change in the trading policies of [Ardent Offshore]."

26. As set forth in more detail below, after Northshore purchased SCM, the Defendants engaged in unlawful conduct, including misappropriation of investor funds through improper loans and several material misrepresentations and omissions concerning: (1) Northshore's ownership of SCM, (2) the management of the Ardent Funds, and (3) the nature of the Ardent Funds' investments. Furthermore, Northshore and its principals made a series of inappropriate investments that rendered statements in the Ardent Funds' offering materials materially misleading.

B. **Northshore's Purchase of SCM and the Defendants' Failure to Disclose to Investors**

27. In late 2002, Kelley approached Saldutti about selling SCM to Northshore. Kelley explained that Northshore was attempting to purchase a variety of hedge funds so that the hedge fund investors could move their investments within an umbrella of Northshore-controlled hedge funds. Kelley also explained that Northshore could provide assistance in helping develop a new hedge fund.

8

28.  In the first quarter of 2003, Saldutti, Kelley, Wildeman, and Sherman met in Connecticut to discuss Northshore's possible purchase of SCM. During this meeting Kelley, Wildeman, and Sherman described the Northshore strategy in detail and explained the potential benefits of selling SCM to Northshore. Kelley, Wildeman, and Sherman told Saldutti that Northshore wanted to build an aggregation of hedge funds and that the hedge funds could then be bundled and sold to a large money management firm. They then told Saldutti that Northshore would raise money and market the Ardent Funds. In addition, they represented that Wildeman had significant experience in cash management and could take over the back office operations and cash management for the Ardent Funds.

29.  Saldutti told Kelley, Wildeman, and Sherman that he was interested in receiving higher returns on his cash investments, but that the cash investments had to be safe, short-term and liquid investments in case Saldutti needed the cash to invest on behalf of the Ardent Funds. Saldutti had always conservatively managed the Ardent Funds' cash leaving it in the BOA prime brokerage account. He believed that Wildeman would take over management of the Ardent Funds' cash and be able to achieve higher returns on the Ardent Funds' significant cash positions. During this meeting, Saldutti agreed to sell SCM to Northshore.

30.  In or about April 2003, Northshore agreed to purchase all the partnership interests in SCM for $12 million, payable in installments of $4 million upon closing and $500,000 quarterly thereafter. Pursuant to an employment agreement with Northshore, Saldutti continued to have putative responsibility for managing the Ardent Funds assets.

### C. The Defendants Made Inappropriate Investments

31. After its purchase of SCM and in breach of the Ardent Funds' offering materials and without disclosure to investors, Northshore took over management of the significant cash positions of the Ardent Funds.

32. Shortly after Northshore acquired SCM, Wildeman contacted Saldutti to discuss the returns on the Ardent Funds' cash at BOA. Thereafter, Wildeman met with a representative of BOA's prime brokerage unit in New York City, where the Ardent Funds' cash investments were held to discuss the Ardent Funds' cash returns. The BOA representative informed Wildeman that BOA was paying the Ardent Funds the "Fed Fund" rate minus 50 basis points on the Ardent Funds' cash. Wildeman told BOA that he could invest the cash in other investment vehicles offering returns of 3% to 4%.

33. In or about the middle of 2003, Saldutti began transferring Ardent Funds' cash to Northshore for investment in "alternative cash investments." Saldutti issued instructions for these transfers to BOA account representatives in New York, New York.

34. After taking over management of the cash portions of the Ardent Funds, Northshore made a series of inappropriate investments using the Ardent Funds' cash. These investments include:

- approximately $3.6 million in AusAm Biotechnologies, Inc. ("AusAm"), a private biotechnology company of which Sherman is a major shareholder and a director;
- approximately $1.0 million in NS Global Opp Fund, a partnership owned by Northshore;
- approximately $611,000 in NS Special Situation Fund I, a partnership owned by Northshore;
- approximately $13.1 million in Startech Environmental Corporation ("Startech"), a publicly traded company in which Northshore owns approximately 20% of the outstanding common stock; and

10

- using $5 million to pay for Northshore's purchase of SCM.

D. **The Defendants Engaged in Self-Dealing With Ardent Funds' Cash**

35. In August 2004, Northshore received a $10 million loan from Ardent Domestic in the form of a 90-day "short-term" loan, which was due in full on November 30, 2004. Northshore has failed to repay any portion of the loan or any interest owing on the loan.

36. In addition, Ardent Domestic has held a note receivable since June 2003 for approximately $5.1 million in NSAM Partners, of which Wildeman, Sherman and Kelley are the sole owners. It appears that there have been no repayments or interest payments on this loan.

37. Northshore received an additional $1.25 million as a purported loan from the Offshore Fund for which no documentation was prepared. Northshore has not repaid this loan.

E. **The Defendants Made Numerous Misrepresentations and Omissions**

38. In connection with the above-described investments and loans, the Defendants made numerous misrepresentations and omissions.

39. The Defendants did not disclose to the Ardent Funds' investors that Northshore was actively managing a significant portion of the Ardent Funds' assets and investing those assets in illiquid securities.

40. The Defendants also did not disclose that Northshore was investing the Ardent Funds' assets in illiquid securities of entities in which Northshore's principals had an interest or that the Ardent Funds' were making loans to entities controlled by Northshore or its principals.

41. The Offshore POM specifically requires notice be given to each shareholder when there is a change in the operational responsibilities of Ardent Offshore and when there is any material change

11

in the trading policies of Ardent Offshore. SCM, Northshore, Wildeman, Sherman and Kelley never gave such notice.

42. Furthermore, Northshore's investments and loans rendered materially misleading the sections of the Domestic POM and the Offshore POM concerning (i) how the Ardent Funds' assets would be invested and (ii) who would be making all investment decisions concerning the Ardent Funds' assets.

E. **Northshore and SCM Inappropriately Denied Investors' Redemption Requests**

43. Northshore and SCM have inappropriately denied Ardent Domestic investors' withdrawal requests. Saldutti informed the investors requesting withdrawals that because Northshore invested the Ardent Funds' cash in improper and illiquid investments and therefore was unable to transfer cash to Ardent Domestic's BOA accounts, the Ardent Funds were unable to satisfy the redemption requests.

F. **Recent Conduct and Ongoing Risk to the Public**

44. In the last 2 weeks: (i) the Commission staff visited Northshore's offices and requested to speak to Northshore's principals, but their request was denied; (ii) the Commission staff made repeated requests to Northshore and its lawyers to find out basic information about the status of the Ardent Funds' assets, but Northshore failed to provide any substantive information beyond vague reassurances that funds were not misused; (iii) Northshore's attorneys told the Commission staff that they were concerned that Northshore's principals may seek to dissipate Northshore's assets; (iv) Northshore's attorneys informed the Commission staff that Northshore intended to file for Chapter 11 bankruptcy, permitting Northshore to control the liquidation of assets, which are rightfully the assets of the Ardent Funds and which Northshore diverted for its own uses; (v) immediately following a Commission staff

request to delay the bankruptcy filing, Northshore, SCM and NSCT filed for bankruptcy in the Northern District of Illinois; and (vi) Department of Justice officials executed 2 search warrants at Northshore's offices in New York and Connecticut.

### FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (All Defendants)

45. Paragraphs 1 through 44 are realleged and incorporated by reference as if fully set forth herein.

46. From at least April 2003 through the present, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by the use of the mails, directly and indirectly, have employed and are employing devices, schemes and artifices to defraud.

47. From at least April 2003 through the present, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by the use of the mails, directly and indirectly, have obtained and are obtaining money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and have engaged and are engaging in transactions, practices or courses of business which operate as a fraud and deceit upon their investors.

48. The Defendants knew or were reckless in not knowing that the representations and omissions set forth herein were false and misleading.

49. By reason of the activities described herein, the Defendants have violated and are

13

violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (All Defendants)

50. Paragraphs 1 through 49 are realleged and incorporated by reference as if fully set forth herein.

51. From at least April 2003 through the present, the Defendants, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, have employed and are employing devices, schemes and artifices to defraud; have made and are making untrue statements of material fact and have omitted and are omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged and are engaging in acts, practices and courses of business which operate as a fraud and deceit upon investors.

52. The Defendants knew or were reckless in not knowing that the representations and omissions set forth herein were false and misleading.

53. By reason of the activities described herein, the Defendants have violated and are violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

## THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### (Northshore and SCM)

54. Paragraphs 1 through 53 are realleged and incorporated by reference as if fully set

14

forth herein.

55. From at least April 2003 through the present, Northshore and SCM, both investment advisers, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or of the mails, have employed and are employing devices, schemes and artifices to defraud the Ardent Funds' investors, and have engaged and are engaging in transactions, practices and courses of business which operate as fraud and deceit upon these investors.

56. The Defendants knew or were reckless in not knowing that the representations and omissions set forth herein were false and misleading.

57. By reason of the activities described herein, Northshore and SCM have violated and are violating, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act
### (Kelley, Wildeman and Sherman)

58. Paragraphs 1 through 57 are realleged and incorporated by reference as if fully set forth herein.

59. From at least April 2003 through the present, Kelley, Wildeman and Sherman, directly or indirectly, singly or in concert, aided and abetted Northshore's and SCM's violations of Sections 206(1) and 206(2) of the Advisers Act. Specifically, Kelley, Wildeman and Sherman knowingly provided substantial assistance to Northshore and SCM in making the materially false and misleading representations and omissions and misappropriations of the Ardent Funds' assets alleged herein.